### FRED SMITH v. THE STATE.

*No. 1503.    Decided December 9th, 1896.*

**1.    Assault with Intent to Murder—Aggravated Assault—Deadly Weapon— Charge.**

On a trial for assault with intent to murder, where the evidence showed, that the assault was made with a breast yoke, which inflicted but slight injury, and a rock, possibly a deadly weapon, with which defendant might or could have slain the injured party, but which he only used to strike one blow, then threw it down and left. Held: That the court should have submitted, in the charge, the issue of aggravated assault, and erred in refusing a special requested instruction upon that issue.

**2.    Same—Specific Intent.**

In assault with intent to murder, the specific intent to kill should be established as a fact beyond all question; and the question is to be decided by the jury.

APPEAL from the District Court of Coleman.    Tried below before Hon. J. O. WOODWARD.

Appeal from a conviction for assault with intent to murder; penalty, two years' imprisonment in the penitentiary.

The testimony, as shown by the record, is as follows:

W. F. Bradford testified: "I know defendant, Fred Smith, a negro; have known him four or five years; I am acquainted with Jack Harwick; I have known him two or three years. On or about July 25th, 1896, defendant, Jack Harwick, Tobe Campbell, a negro, and myself, were out near the saloon sitting down playing cards, and defendant, Fred Smith, said something to Jack Harwick about Jack Harwick being a traitor and giving defendant away before the grand jury about playing cards. After awhile Jack Harwick and Tobe Campbell pulled out of the game and Jack Harwick lay down and went to sleep. After a while Jack got up and wanted to come into the game again, and he and defendant commenced quarreling over a grand jury scrape; defendant told Jack Harwick that he reported defendant to the grand jury for playing cards,

and that he could not come in the game with him.   Jack said he done only what he was forced to do.   Fred said, 'You are a liar and a son-of-a-bitch.'   Jack said, 'Don't call me that.'   Defendant said, 'You heard what I said, didn't you?'   They both arose and clinched and commenced fighting.   Fred pushed Jack over and was holding him there and I caught Fred by the throat and pulled him off of Jack.   Fred said, 'The son-of-a-bitch cut me.'   I did not see Jack with a knife.   I stepped away a few steps, and looked around and saw Fred pick up a breast yoke, lying near a wagon of some campers that had stopped there that night.   Jack Harwick was sitting on the wagon tongue, and Fred Smith stepped up behind him (Jack Harwick) and struck him on the neck, just above the shoulders, with the breast yoke and knocked him down on the ground.   After Jack fell, defendant struck him two or three times with the breast yoke, and Jack said, 'Don't, don't.'   I started towards them, and Fred threw down the breast yoke and ran away.   I then started on down towards the saloon, and I met Fred coming back towards Jack with a rock in his hand; I followed him as fast as I could, and before I got to him he got to where Jack was sitting down on the ground, and Fred Smith struck him with the rock just over the eye and knocked him over on the ground.   Fred ran away, and went down towards the saloon.   Jack laid there awhile, got up and we went on down to the saloon, and after we went into the saloon and laid down on the floor, I saw Fred with something like a barrel stave or piece of something in his hand, out near the door of the saloon.   Tobe Campbell, Jack, and myself, went down to the well in the hollow and washed the blood off of the wound.   Jack was hurt just above the eye.   When we washed it I bound it up, because I was afraid he would bleed to death.   Tobe Campbell and Jack went on down to Dr. Guiger's.   Think I would know the rock Fred had there that night.   I identify the rock (shown the witness) as the rock Fred Smith had at the difficulty, and hit Jack Harwick with.   The breast yoke that defendant hit Jack Harwick with was about two and a half or three feet long, about one inch in diameter at the ends and about two or two and a half inches in diameter in the middle; it was round, and an ordinary breast yoke.   This all occurred in Coleman County, Texas.   The rock will weigh, I judge, about four pounds."   Cross-examined, testified:   "We were all drinking some that night of the difficulty.   None of us were drunk except Tobe Campbell.   Jack Harwick, defendant and myself had taken a few drinks of whiskey that night; I had drank two or three drinks.   We were out on the prairie about sixty or seventy steps from the saloon.   Fred had a bottle of whiskey out there, and I believe after we drank that, Jack Harwick went down to the saloon and got a small bottle of whiskey, and it was drank up.   We went out there about dark and played cards until the difficulty came up, about 1 o'clock next morning; we were playing poker.   It was a dark night, and when defendant and Jack Harwick clinched in the fight they knocked over our lantern and put it out, and we were in the dark from that time on.   We were under a sorter of

a tent, and had a lantern where we were playing cards, and before the difficulty. Defendant struck Jack Harwick but one time with the rock, and held it in his hand when he struck him."

Jack Harwick testified: "My name is Jack Harwick; I know the defendant, Fred Smith; have known him six or seven years. I had a difficulty with defendant on or about the night of July 25th, 1896, out near the Shearmarker saloon, in Coleman County, Texas. We were out there playing poker, and I got tired of playing and lay down awhile, and then got up, threw my money down on the blanket and told them to deal me a hand and I will play some more. Defendant answered, 'No you won't; you give me away, and caused me to have to pay a fine for playing cards.' I told him if I did it was in the grand jury room, and I had it to do. He said, 'You are a lying son-of-a-bitch, you did not have to do any such thing;' and when he said that, we were sitting on our 'hunkers;' we clinched. He caught me around the body, and I caught him by the neck, and he was pushing me back, and did push me back, and was on top of me when Mr. Bradford choked him off of me, and when Bradford pulled him off of me, Fred remarked, 'He has cut me.' We both clinched and commenced fighting about the same time. When Bradford pulled Fred off of me, I went and sat down on a wagon tongue, off a few steps from our tent, and Fred walked up behind me and hit me with a breast yoke; I did not know where he was or that he was coming on to me 'till he was in the act of striking, when I dodged and he struck me on the shoulder. The first lick knocked me off the wagon tongue, and then hit me in the side three or four times, and threw down the breast yoke and ran off. I thought he was gone, but directly he came back to where I was sitting down on the ground back of the wagon, resting my head in my hand, leaning with my elbow on the ground, and struck me just above the eye with a rock and knocked me over on the ground. I did not know he was near me until he struck at me with the rock; threw the rock down and ran away. He knocked me senseless, and I do not know where he went. I struggled around there awhile, and Bradford came to where I was and helped me up. Tobe Campbell, Bradford and myself went on down to the well, washed my face and the blood off of my face, then we went to the saloon; I lay down in the door; was feeling sick. I stayed there awhile, and Tobe Campbell, the negro, and I went down to Dr. Guiger's and got him to dress the wound over my eye, and I went home. It hurt me for two or three days. I recognize the rock (exhibited to him) here shown me as the rock found on the ground next morning where the difficulty occurred; it looks like the rock he hit me with." Cross-examined, testified: "Fred Smith carried a half-pint bottle of whiskey out where we played cards. The crowd drank it up, and I went and got some more whiskey —a half-pint bottle; we all drank that. I was not drunk; Tobe Campbell was drunk; balance of us were not, but drinking some. Defendant and I had never had any trouble before that night; we had had some words before that. After we went down to the well to wash my face, one of us

called to defendant, Fred Smith, to come down there; I believe I was the one who told Tobe Campbell to call him. It was a pretty dark night; no moon was shining that I remember of. When Fred and I commenced fighting we knocked the lantern over and put out the light. When Bradford separated defendant and I, at the time defendant called me a lying son-of-a-bitch and we clinched, the defendant said, 'I don't want to hurt him (that is me) but he has cut me.' I did not cut defendant in the difficulty; I did not at any time have a knife out. I did say to Victor Shearmarker, down at the saloon, after the difficulty, that if I had had my knife I would have killed defendant, and I would have done it. I did have my knife, but it was in my pocket, and the point of it is and was broken off at that time. I don't remember to have told Victor Shearmarker at the saloon, that if the point of my knife had not broken off I would have killed the defendant. I had no quarrel or controversy with the defendant about me giving him away on playing cards, until the difficulty came up; nothing was said about it until I wanted to get back in the game, and I threw my money down and asked to be let in the game."

M. C. Guiger, testified: "My name is M. C. Guiger; I live in the town of Coleman, and am a practicing physician, and I cannot state the particular time Jack Harwick came to see me, but it was about July 25th, 1896. It was about 2 or 3 o'clock in the night when Jack Harwick came to my house. Tobe Campbell came with him, and they waked me up, and wanted me to look after a wound over his (Jack Harwick's) eye. It was a wound just over the left eye. He did not complain of any other injury; said that he had been struck in the side, but that it did not amount to anything, and that all he wanted me to look after was the wound over his eye. It was on the frontal bone, just over the left eye, and the skin was cut through to the bone, and the cut place was an inch or an inch and a half long. The frontal bone, just over the eye, was slightly fractured. I dressed his eye and he went away. This was all I ever had to do with it. I considered the wound a serious wound, but it did not result in any seriousness." Cross-examined, testified: "In my opinion the wound was a serious one, for the reason that it might have caused an injury to the brain, provided it had injured the blood vessels in that vicinity. The wound, in fact, did not result in anything serious or cause said Harwick any serious or permanent injury. I don't know how long he was confined with it. I saw him up around town some few days afterward; how many, I cannot state."

Victor Shearmarker, testified: "I know defendant, Fred Smith, and Jack Harwick. I remember the time of the difficulty in question between defendant and Jack Harwick. I did not see it, but they all came into my saloon after it occurred, and in a conversation with Jack Harwick there that night, concerning the difficulty, Jack Harwick said that if the point of his knife had not been broke off he would have killed the defendant."

*Sims & Snodgrass,* for appellant.

*Mann Trice,* Assistant Attorney-General, for the State.

DAVIDSON, JUDGE.—Appellant was convicted of an assault with intent to murder, and his punishment assessed at two years in the penitiary, hence this appeal. While it is true that the court instructed the jury, "If you believe, from the evidence, beyond a reasonable doubt, that the defendant, with a deadly weapon or instrument, calculated or likely to produce death or serious bodily injury from the manner in which it was used, and with malice aforethought, did assault the said Jack Harwick, with the specific intent then and there to kill and murder him, then find the defendant guilty of an assault with intent to murder" —still this does not relieve the court of the necessity of submitting to the jury aggravated assault and battery. The appellant may have used a deadly weapon in committing the assault, and inflicted serious bodily injury upon the party assaulted, and still not intend to kill him. The intention to kill, on the other hand, can be inferred or established, notwithstanding the weapon used is not a deadly weapon. The surrounding circumstances may fix this intention. In the case before us, the testimony is not absolutely conclusive of the intent. It does not establish the fact, beyond all question, that appellant intended to kill the deceased. If the assault had been made with a gun, within shooting range, being a deadly weapon, the intent to kill would have been overwhelmingly established. If it had been made with a bowie knife, and in a deadly manner, then this intent would have been so clearly established as to supercede the necessity of submitting aggravated assault and battery. But this case is one in which a breast yoke and a rock were used. The rock may have been a deadly weapon. The injuries inflicted by the breast yoke seem to have been very slight. Those inflicted by the rock were serious, but nothing is shown to prevent appellant from repeating the blows with the rock. He could have killed the prosecutor with the rock, but he struck him only one blow, and threw the rock down, and left. Now, here was a question of fact, to be decided by the jury—was the blow inflicted with the specific intent to kill, or was it inflicted without such intent? The charge of the court failed to submit aggravated assault and battery to the jury. There was nothing left for the jury but conviction of an assault to murder, or an acquittal. This was an outrageous, unprovoked assault, and the jury would not be disposed to entirely acquit the defendant; whereas, if aggravated assault and battery had been submitted to them, they might have taken that view of the case. Such a charge was requested by the appellant, and refused by the court. We think the refusal of the court to give this charge was error. See, Pefferling v. State, 40 Texas, 486. There is no difference between an assault to murder and an assault to rape, so far as this question of intent is concerned. The intention is of the highest importance in both cases. The opinion of Judge Moore, in the cited case, applies to this case with as great force as it does to that. For the error discussed, the judgment is reversed, and the cause remanded.

*Reversed and Remanded.*